**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLIDUS COMMUNICATIONS, INC. (*f/k/a* TELCO CUBA, INC.), *Plaintiff,* v. EMA FINANCIAL, LLC, EMA GROUP, LLC, and FELICIA PRESTON, *Defendants.* | **Civil Action No. _______________** **COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiff Solidus Communications, Inc. (*f/k/a* Telco Cuba, Inc.) ("Plaintiff" or "Solidus"), by and through its undersigned counsel, respectfully states as follows for its Complaint against Defendants EMA Financial, LLC ("EMA" or the "Enterprise"), EMA Group, LLC ("EMA Group"), and Felicia Preston ("Preston," and together with EMA Group, the "EMA Managers," and together with EMA, the "Defendants").

**THE PARTIES**

1. Solidus is a Nevada corporation with its principal place of business located at 454 S Yonge Street, 7C, Ormond Beach, FL, 32174.

2. Solidus is a microcap company that trades on the OTC (Over-the-Counter) Marketplace.

3. Solidus was formerly known as "Telco Cuba, Inc.," until it changed its name to "Solidus Communications, Inc." on or about June 14, 2021.

4. EMA is a limited liability company organized under the laws of the State of Delaware, with its principal place of business and headquarters located at 40 Wall Street, 17th

Floor, New York, NY 10005.

5. Upon information and belief, EMA Group is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business and headquarters located in the state of New York at 40 Wall Street, 17th Floor, New York, NY 10005.

6. Upon information and belief, EMA Group is the investment manager of EMA.

7. Upon information and belief, EMA Group is wholly owned and controlled by Preston.

8. Defendant Preston, upon information and belief, is a permanent resident, domiciled, and therefore a citizen of, the State of New York.

9. Upon information and belief, Preston is the managing member of EMA Group, and at all relevant times has possessed the power and authority to, directly or indirectly, control EMA's statements, representations, and decisions due to her power and authority to directly, or indirectly, control EMA Group.

## <u>JURISDICTION AND VENUE</u>

10. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Racketeer Influenced and Corrupt Organizations (RICO) Act. *See* 18 U.S.C. §§ 1961, *et seq.*

11. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this District pursuant to 27 U.S.C. § 1391(b)(1) and (2), because a substantial part of the events giving rise to this action occurred in this District as Defendants operated their business out of this District.

13. Venue is also proper because the governing law provision on the Loan Contract (defined herein) explicitly states that any action brought by either party against the other

concerning the transactions must be brought only in the civil or state courts of New York or in the federal courts located in the State and County of New York. *See* Loan Contract at § 4.6.

## FACTUAL BACKGROUND

### *EMA's General Business Model*

14. EMA was formed on or about November 14, 2014, and is in the business of usurious lending.

15. EMA conducts its lending business through loans styled as convertible notes that contain a floating-price conversion right that—as explained in greater detail herein—provides EMA with the right to convert the debt into shares of the borrowing-issuer's common stock at a fixed discount to prevailing market prices.

16. Publicly-available information demonstrates that, since 2015, EMA has made ***no less than 150 loans***—styled as convertible promissory notes—to ***more than 130 different issuers*** (as borrowers).

17. EMA—located in and operating from New York—has collected loans it made to businesses across the United States, including but not limited to Washington,[1] North Carolina,[2] and California.[3]

18. Through its convertible note lending business, EMA has collected more than ***11 billion* shares of discounted common stock** that have enabled EMA to generate ***millions—if not billions—in gross profits.***

19. Upon information and belief, a substantial portion—*if not all*—of EMA's are governed by New York law.

[1] *See* DigitalTown, Inc., Form 10-Q, filed January 30, 2019 *available at* https://bit.ly/3O4u8tB.
[2] *See* Blue Sphere Corporation, Form 10-K, filed Dec. 31, 2017, *available at* https://bit.ly/3I3TXGx.
[3] *See* Cerebain Biotech Corp., Form 10-Q, filed Feb. 19, 2019, *available at* https://bit.ly/3I2NRq0.

20. Under New York law, the conversion right is a source of interest and, when combined with the stated interest rate and additional original issue discount (OID) interest, causes the loan to charge a rate of interest well in excess of 25% A.P.R.

21. Stated differently, EMA's loans are criminally usurious. *See* N.Y. Penal Law § 190.40.

***EMA's Business Model as Applied to Plaintiff***

22. On July 6, 2015, Plaintiff and EMA entered into a loan transaction, styled as a convertible note. *See* **Exhibit 1** (10% Convertible Note) ("Loan Contract").

23. The Loan Contract contemplates that EMA would loan Plaintiff $100,000.00, subject to a stated interest rate of 10% per annum. Loan Contract at 1.

24. The Loan Contract further contemplates that EMA, at its option, could convert all or any amount of the debt owed under the Loan Contract into newly-issued shares of Solidus common stock at a per share price equal to 50% of the *lowest* sale price during the 20-trading days prior to the conversion request. *See* Loan Contract at § 1.2(a).

25. Stated differently, EMA was entitled to acquire Solidus stock at a 50% discount to its lowest sale trading price during the 20-trading day period prior to EMA's conversion request. *Id.*

26. The Loan Contract is governed by the laws of the State of New York. *Id.* at § 4.6.

27. The floating-price conversion right EMA reserved itself in the Loan Contract is an additional source of interest that must be considered when calculating the true interest rate under New York's usury laws. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021).

28. The floating-price conversion discount causes the Loan Contract to charge an ***additional 100% interest per annum***.

29. The additional interest charged by the Loan Contract's floating-price conversion

discount is calculated as follows:

50% (the Loan Contract's Conversion Discount) *divided by* 50%[4]

*equals* .10 or 100%

30. When the Loan Contract's stated interest of 10% per annum is combined with the additional interest charged through floating-price conversion option, ***the true total interest of the Loan Contract is equal to 110% A.P.R., or more than 4.4 times the maximum lawful rate of interest allowed by New York's usury laws.*** *See* N.Y. Penal § 190.40.

31. To further illustrate the usurious interest charged by the Loan Contract's floating-price conversion right, under a $1.00 discount calculation, EMA would receive common shares as if its price was only 50 cents per share. Under this hypothetical, a $50.00 conversion of debt would be paid with 100 shares of stock that are worth $100.00 (at a per share price of $1.00), and a $100.00 conversion of debt would be repaid with 200 shares worth $200.00.

32. The excessive consideration EMA collected through the conversions submitted pursuant to the Loan Contract (discussed in greater detail below), further demonstrates the excessive, usurious interest rate EMA charged Solidus through the Loan Contract.

33. The EMA Managers purposefully and intentionally negotiated for and obtained the floating-price conversion right set forth in the Loan Contract knowing that it would provide them with the ability to collect additional consideration at a usurious rate.

34. On or about July 9, 2015, EMA wire transferred the sum of $95,000.00 to Solidus pursuant to the Loan Contract.

[4] Conversion Price is the price afforded to the lender (EMA) to acquire common stock from the borrower (Solidus) at a discount in lieu of collecting cash on the debt outstanding. To calculate the conversion price, subtract the conversion discount by 100%. Here, the conversion discount is 50%. Therefore, 100% *minus* 50% yields a conversion price of 50%.

35. EMA subsequently collected the Loan Contract on twelve separate occasions through the conversion feature.

36. Specifically, EMA collected the debt imposed by the Loan Contract on the dates and in the amounts as follows:

a. On or about February 3, 2016, EMA converted $786.97 of debt charged under the Loan Contract into 3,934,873 shares of Solidus common stock, which had an estimated aggregate value of $17,706.93;[5]

b. On or about September 8, 2017, EMA converted $12,570.00 of debt charged under the Loan Contract into 33,300,000 shares of Solidus common stock, which had an estimated aggregate value of $16,650.00;[6]

c. On or about October 9, 2017, EMA converted $10,275.00 of debt charged under the Loan Contract into 44,100,000 shares of Solidus common stock, which had an estimated aggregate value of $30,870.00;[7]

d. On or about November 13, 2017, EMA converted $7,725.00 of debt charged under the Loan Contract into 56,500,000 shares of Solidus common stock, which had an estimated aggregate value of $22,600.00;[8]

e. On or about December 13, 2017, EMA converted $7,750.00 of debt charged under the Loan Contract into 85,000,000 shares of Solidus common stock, which had an estimated aggregate value of $17,000.00;[9]

f. On or about January 16, 2018, EMA converted $5,500.00 of debt charged under the Loan Contract into 125,000,000 shares of Solidus common stock, which had an estimated aggregate value of $50,000.00;[10]

---

[5] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00450) as of the date of conversion (February 3, 2016).
[6] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00050) as of the date of conversion (September 8, 2017).
[7] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00070) as of the date of conversion (October 9, 2017).
[8] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00040) as of the date of conversion (November 13, 2017).
[9] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00020) as of the date of conversion (December 13, 2017).
[10] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00040) as of the date of conversion (January 16, 2018).

g. On or about February 26, 2018, EMA converted $14,550.00 of debt charged under the Loan Contract into 306,000,000 shares of Solidus common stock, which had an estimated aggregate value of $30,600.00;[11]

h. On or about February 11, 2019, EMA converted $16,150.00 of debt charged under the Loan Contract into 338,000,000 shares of Solidus common stock, which had an estimated aggregate value of $101,400.00;[12]

i. On or about March 19, 2019, EMA converted $17,750.00 of debt charged under the Loan Contract into 370,000,000 shares of Solidus common stock, which had an estimated aggregate value of $37,000.00;[13]

j. On or about December 11, 2020, EMA converted $3,900.00 of debt charged under the Loan Contract into 93,000,000 shares of Solidus common stock, which had an estimated aggregate value of $18,600.00;[14]

k. On or about January 12, 2021, EMA converted $18,545.66 of debt charged under the Loan Contract into 385,913,000 shares of Solidus common stock, which had an estimated aggregate value of $154,365.28;[15] and

l. On or about February 25, 2021, EMA converted $24,418.48 of debt charged under the Loan Contract into 164,198,867 shares of Solidus common stock, which had an estimated aggregate value of $410,497.17.[16]

37. In total, EMA collected ***$907,289.38*** of consideration from Plaintiff through conversions made pursuant to the Loan Contract.

38. Pursuant to the Loan Contract, EMA advanced to Plaintiff $95,000.00 but subsequently collected $907,289.38 worth of consideration. Thus, ***EMA collected $812,289.38 worth of consideration in excess of what was loaned to Solidus.***

---

[11] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00010) as of the date of conversion (February 26, 2018).
[12] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00030) as of the date of conversion (February 11, 2019).
[13] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00010) as of the date of conversion (March 19, 2019).
[14] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00020) as of the date of conversion (December 11, 2020).
[15] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00040) as of the date of conversion (January 12, 2021).
[16] Calculated by multiplying the number of shares issued and Solidus' common stock closing price ($0.00250) as of the date of conversion (February 25, 2021).

### *The RICO Enterprise*

39. EMA is a legal entity—formed in 2014—and legally distinct from the EMA Managers.

40. EMA is the RICO "enterprise" within the meaning set forth in 18 U.S.C. § 1961(4).

41. The goal, objective, and/or purpose of the Enterprise is to profit from the collection of usurious debts that are charged through convertible notes, such as the Loan Contract.

42. Publicly-available information demonstrates that the Enterprise has been actively engaged in its unlawful business of usurious lending since at least 2014.

43. Publicly-available information demonstrates that the Enterprise has made similar, unlawful loans governed by New York law to other companies, including, for example:

a. During October 2018, DigitalTown, Inc. ("DigitalTown") entered into a loan transaction, styled as a convertible note, with EMA, pursuant to which EMA loaned DigitalTown $53,000.00 subject to a stated interest rate of 10% per annum, and providing EMA with the right to convert the debt owed under the loan into shares of DigitalTown common stock at a discounted price equal to 61% of the lowest sale price for DigitalTown's common stock during the 15-day trading period preceding the date of conversion (the "DigitalTown Loan");

b. During December 2017, Blue Sphere Corporation ("Blue Sphere") entered into a loan transaction, styled as a convertible note, with EMA, pursuant to which EMA loaned Blue Sphere $125,000.00 subject to a stated interest rate of 12% per annum, and providing EMA with the right to convert the debt owed under the loan into shares of Blue Sphere common stock at a discounted price equal to 65% of the lowest sale price for Blue Sphere's common stock during the 20-day trading period preceding the date of conversion (the "Blue Sphere Loan");

c. During February 2018, Cerebain Biotech Corp. ("Cerebain") entered into a loan transaction, styled as a convertible note, with EMA, pursuant to which EMA loaned Cerebain $110,000.00 subject to a stated interest rate of 10% per annum, and providing EMA with the right to convert the debt owed under the loan into shares of Cerebain common stock at a discounted price equal to 55% of the lowest sale price for Cerebain's common stock during the 20-day trading period preceding the date of conversion (the "Cerebain Loan"); and

d. During September 2018, DarkPulse, Inc. ("DarkPulse") entered into a loan transaction, styled as a convertible note, with EMA, pursuant to which EMA loaned DarkPulse $100,000.00 subject to a stated interest rate of 8% per annum, and providing EMA with the right to convert the debt owed under the loan into shares of DarkPulse common stock at a discounted price equal to 65% of the lowest price for DarkPulse's common stock during the 20-day trading period preceding the date of conversion (the "DarkPulse Loan").

44. The EMA Usurious Loans are governed by New York law and violate New York's usury laws in that they charge interest rates in excess of the 25% A.P.R. maximum lawful rate of interest. *See* N.Y. Penal § 190.40.

45. Simple calculations reveal that each of the EMA Usurious Loans charge more than 25% A.P.R.:

a. DigitalTown Loan:

<u>Step 1: Calculate the Conversion Discount Interest</u>

39 (Conversion Discount) *divided by* 61[17]
*equals* .639 or 64% (Conversion Discount Interest)

<u>Step 2: Calculate the Total Interest</u>

64% *plus* 10% (Stated Interest) *equals* ***74% A.P.R***

b. Blue Sphere Loan:

<u>Step 1: Calculate the Conversion Discount Interest</u>

35 (Conversion Discount) *divided by* 65[18]
*equals* .538 or 53.8% (Conversion Discount Interest)

[17] 61 is the difference between 100 and the conversion discount (39). The 50 is the conversion price, or the price that EMA is paying to acquire the borrower's common stock. By dividing the conversion discount to EMA by the conversion price EMA pays to acquire the borrower's common stock, the result yields the conversion discount interest.

[18] 65 is the difference between 100 and the conversion discount (35). The 65 is the conversion price, or the price that EMA is paying to acquire the borrower's common stock. By dividing the conversion discount to EMA by the conversion price EMA pays to acquire the borrower's common stock, the result yields the conversion discount interest.

Step 2: Calculate the Total Interest

53.8% *plus* 12% (Stated Interest) *equals* ***65.8% A.P.R***

c. Cerebain Loan:

Step 1: Calculate the Conversion Discount Interest

45 (Conversion Discount) *divided by* 55[19]
*equals* .818 or 81.8% (Conversion Discount Interest),

Step 2: Calculate the Total Interest

81.8% *plus* 6% (OID) *plus* 10% (Stated Interest) *equals* ***97.8% A.P.R***

d. DarkPulse Loan:

Step 1: Calculate the Conversion Discount Interest

30 (Conversion Discount) *divided by* 70[20]
*equals* .428 or 43% (Conversion Discount Interest), *plus* 6% (OID) *equals* .49
or 49%, *multiplied* by 12/9[21] *equals* .6506% or 65.1% (Conversion Discount with OID Pro rated)

Step 2: Calculate the Total Interest

65.1% *plus* 8% (Stated Interest) *equals* ***73.1% A.P.R***

46. EMA's performance of the EMA Usurious Loans demonstrates that the floating-price conversion right charges a usurious rate of interest:

a. Under the DigitalTown Loan, EMA loaned $53,000.00 to DigitalTown and collected no less than 399,000,000 shares of DigitalTown common stock with an estimated aggregate value of $187,900.00—***more than 3.5 times (and approximately $134,000.00 of out-of-pocket loses) what DigitalTown was advanced;***

---

[19] 55 is the difference between 100 and the conversion discount (45). The 55 is the conversion price, or the price that EMA is paying to acquire the borrower's common stock. By dividing the conversion discount to EMA by the conversion price EMA pays to acquire the borrower's common stock, the result yields the conversion discount interest.

[20] 70 is the difference between 100 and the conversion discount (30). The 70 is the conversion price, or the price that EMA is paying to acquire the borrower's common stock. By dividing the conversion discount to EMA by the conversion price EMA pays to acquire the borrower's common stock, the result yields the conversion discount interest.

[21] The DarkPulse Note has a 9-month maturity. Because of this, the summation of the conversion discount and the OID needs to be pro-rated on a 9-month maturity (12/9) to determine the total A.P.R. charged under the DarkPulse Note.

b. Under the Blue Sphere Loan, EMA loaned $125,000.00 to Blue Sphere and collected no less than 9,486,800 shares of Blue Sphere common stock with an estimated aggregate value of $490,982.46 —***nearly 4 times (and more than $350,000.00 of out-of-pocket loses) what Blue Sphere was advanced;***

c. Under the Cerebain Loan, EMA loaned $103,400.00 to Cerebain and collected no less than 18,833,250 shares of Cerebain common stock with an estimated aggregate value of $294,449.20—***more than 2 ¾ times (and more than $191,049.20 of out-of-pocket loses) what Cerebain was advanced;*** and

d. Under the DarkPulse Loan, EMA loaned $100,000.00 to DarkPulse and collected no less than 563,042,000 shares of DarkPulse common stock with an estimated aggregate value of $262,552.20—***more than 2 ½ times (and more $170,000.000 of out-of-pocket loses) what DarkPulse was advanced.***

47. Stated differently, in each of the EMA Usurious Loans (like here), EMA used the conversion feature to collect consideration worth several times more than what EMA actually loaned and, thus, caused the borrowing issuer to suffer thousands—*if not hundreds of thousands and even millions*—of out-of-pocket losses.

48. Upon information and belief, EMA has made ***more than 130 other usurious loans***, each governed by New York law, that (a) are unenforceable under New York law because they charged criminally usurious rates of interest and (b) charge a total interest rate that was twice the maximum enforceable rate of interest allowed by New York law, and, thus, EMA has charged, collected, and profited from the unlawful debts charged to other issuers.

49. The volume of loans and proceeds and profits generated therefrom during a prolonged period of time—starting as early as 2014 and continuing through the date hereof—demonstrates that EMA is in the business of usurious lending.

***The RICO Culpable Persons***

50. The EMA Managers are each individuals who are capable of holding a legal and/or beneficial interest in property and, therefore, each of the EMA Managers are a "person" within the meaning set forth in 18 U.S.C. § 1961(3).

51. The Enterprise (EMA), on the one hand, and the EMA Managers (EMA Group and Preston), on the other hand, are legally distinct from each other.

52. The Enterprise and the EMA Managers are legally distinct from each, and each have legal rights, responsibilities, obligations, power, and privileges separate and apart from each other.

53. The Enterprise commits its RICO violations of unlawful debt collection under the direction and control of the EMA Managers.

54. The EMA Managers, collectively or individually, are the managing members and, thus, ultimate decision makers of EMA.

55. EMA Group is a RICO culpable person because, *inter alia*:

a. EMA Group is an individual capable of holding a legal or beneficial interest in property.

b. Upon information and belief, EMA Group is the sole control person and decision makers of EMA and, at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control EMA's statements, representations, and decisions.

c. Upon information and belief, EMA exercises decision making authority over EMA's acts and decisions, executes all agreements and the majority—if not all—of the conversion notices submitted thereunder, and approves the majority—if not all—of EMA wire transfers to the borrower.

d. Upon information and belief, EMA Group is responsible for the day-to-day operations of EMA and has final say on all of its business decisions, including without limitation which usurious loans EMA will fund and when to collect—and how much to collect—on such unlawful loans.

e. Upon information and belief, EMA Group is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by EMA to accomplish its goals, objectives, and/or purpose, chiefly among which being usurious lending, including: (i) supervising agents and/or employees of EMA, including, *inter alia*, Jamie Beitler, Steven Fox, John Scholz, and Ilya Aleksandrovich; (ii) determining the form of the agreements used by EMA to disguise its usurious loans as lawful lending transactions to hide its true business of usurious lending, including the Loan

Contract in this case; (iii) determining the form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-price conversion right; (iv) approving the making of the usurious loans to issuers who the Enterprise has solicited and/or applied for such usurious loans; (v) establishing and maintaining the methods of collecting the payments on the usurious loans, including requesting issuer's transfer agents to enter into irrevocable instruction agreements and retaining lawyers to author legal opinion letters to ensure conversion requests are properly submitted and processed.

f. Upon information and belief, EMA Group takes actions and directs employees and/or agents of the Enterprise to take actions necessary to accomplish the overall goals, objectives, and/or purpose of the Enterprise.

56. Preston is a RICO culpable person because, *inter alia*:

a. Preston is an individual capable of holding a legal or beneficial interest in property.

b. Upon information and belief, Preston is the sole control person and decision maker of EMA Group and, at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control EMA Group's statements, representations, and decisions. Thus, at all relevant times, Preston is the ultimate control person and decision maker of EMA and, at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control EMA's statements, representations, and decisions.

c. Upon information and belief, Preston—directly or indirectly through EMA Group—exercises final decision making authority over EMA's acts and decisions, executes all agreements and the majority—if not all—of the conversion notices submitted thereunder, and approves the majority—if not all—of EMA wire transfers to borrower.

d. Upon information and belief, Preston—directly or indirectly through EMA Group—is responsible for the day-to-day operations of EMA and has final say on all of its business decisions, including without limitation which usurious loans EMA will fund and when to collect—and how much to collect—on such unlawful loans.

e. Upon information and belief, Preston—directly or indirectly through EMA Group—is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by EMA to accomplish its goals, objectives, and/or purpose, chiefly among which being usurious lending, including: (i) supervising agents and/or employees of EMA, including, *inter alia*, Jamie Beitler, Steven Fox, John Scholz, and Ilya Aleksandrovich; (ii) determining the form of the agreements used by EMA

to disguise its usurious loans as lawful lending transactions to hide its true business of usurious lending, including the Loan Contract in this case; (iii) determining the form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-price conversion right; (iv) approving the making of the usurious loans to issuers who the Enterprise has solicited and/or applied for such usurious loans; (v) establishing and maintaining the methods of collecting the payments on the usurious loans, including requesting issuer's transfer agents to enter into irrevocable instruction agreements and retaining lawyers to author legal opinion letters to ensure conversion requests are properly submitted and processed.

f. Upon information and belief, Preston—directly or indirectly through EMA Group—takes actions and directs employees and/or agents of the Enterprise to take actions necessary to accomplish the overall goals, objectives, and/or purpose of the Enterprise.

57. At all times relevant hereto, each of the EMA Managers intended to engage in the practice of making and collecting upon the usurious loans charged through the convertible notes, including the Loan Contracts, with the knowledge that such activities were unlawful, and not in good faith.

58. Upon information and belief, through millions—*possibly even tens of millions*—of dollars in salaries, bonuses, profits, and/or other distributions from the Enterprise, each of the EMA Managers has financially benefited from the Enterprise achieving its goals, objectives, and/or purpose of making and collecting on unlawful debts.

***RICO Act: Unlawful Debt Collection***

59. The Enterprise (EMA)—at the direction of the EMA Managers—engages in the RICO act of unlawful debt collection, as defined in 18 U.S.C. § 1961(6).

60. As alleged herein, EMA has, since 2014, engaged in the business of usurious lending, in violation of New York law.

61. The transaction imposed by the Loan Contract is a loan; it memorializes a promise by Plaintiff to repay to EMA the loaned principal, plus interest, in some form of consideration by

a maturity date.

62. The Loan Contract (and transaction imposed thereby) is unenforceable in whole pursuant to New York's usury laws because it charges interest at a rate exceeding 25% A.P.R., in violation of New York Penal Law § 190.40.

63. By charging more than 50% A.P.R., the Loan Contract charges interest at a rate more than double the lawful maximum rate of interest permitted by New York's usury laws.

***The RICO Enterprise Affects Interstate Commerce***

64. EMA is engaged in interstate commerce and uses the instrumentalities of interstate commerce in its usurious lending business, as described herein.

65. EMA is located in New York and operates its usurious lending business from within the State of New York, where it, *inter alia*, negotiates the usurious loan from New York, memorializes the usurious loans in New York, lends money from its bank accounts situated in New York, and subsequently decides when to collect the usurious debt via conversions from New York.

66. EMA, in furtherance of its usurious lending business, extensively used interstate emails, mail, wire transfers, and securities transactions to, among other things, coordinate with persons situated outside the State of New York to facilitate its goal of usurious lending and unlawful debt collection.

67. For example, as it concerns Plaintiff, Solidus's Chief Executive Officer—William Sanchez—resided in and worked from Solidus's headquarters in Florida. Thus, all interactions, communications, and negotiations by and between EMA and Solidus, including the drafting and the ultimate execution of the Loan Contract and EMA's subsequent wiring of the agreed upon funds to Solidus, affected interstate commerce as such interactions, communications, and negotiations were conducted through the usage of the means of interstate commerce (*e.g.*, mail,

emails, texts, wire transfers).

68. EMA, in the furtherance of its usurious lending business, also (a) conducts meetings and conferences outside the State of New York with potential borrowers, and (b) commences actions and prosecutes its claims against businesses in New York and across the United States.[22]

***Plaintiff Has Been—And Continues To Be—Injured By Defendants' Collection of the Unlawful Debt***

69. Plaintiff would not have suffered the injuries and damages but for the violations of RICO alleged herein, including both the overt acts of collecting the unlawful debts and conspiracy to commit such RICO acts.

70. The injuries to Plaintiff directly, proximately, reasonably, and foreseeably resulting from or caused by the violations of RICO alleged herein include, but are not limited to, the remittance of valuable consideration—newly issued shares of Plaintiff's common stock—in excess of the amount that was actually loaned to Plaintiff through the Loan Contract, a loan transaction that is (i) void in whole because of New York's usury laws,[23] and (ii) charge an interest rate that is at least twice the maximum lawful rate of interest allowed by New York's usury laws.[24]

71. Specifically, Plaintiff has remitted consideration with an estimated aggregate value of ***$907,289.38—<u>$812,289.38 in excess</u> of what was actually loaned to Solidus.***

72. Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the RICO violations alleged herein.

73. All of the foregoing harm was foreseeable by the Defendants and was directly and

[22] *See, e.g., In re 5Barz International Inc.*, Case No. 1:20-BK-14866 (Bankr. S.D. Fla.); *In re Pharmagreen Biotech, Inc.*, Case No. 3:20-BK-50780 (Bankr. D. Nev.); *In re Enertrade Electric, LLC*, 4:19-BK-42887 (Bankr. E.D. Tex.).
[23] *See Adar Bays, supra.*
[24] *See* N.Y. Penal § 190.40.

proximately caused by their violations of RICO alleged herein.

74. The assessment of the total damages to Plaintiff due to the Defendants' violations of RICO alleged herein is difficult to quantify and will be determined at trial.

## CAUSES OF ACTION

### *Count I: RICO, 18 U.S.C. § 1962(c)*

### *(Against the EMA Managers)*

75. Plaintiff repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

76. EMA is an "enterprise" within the meaning set forth in RICO, § 1961(4).

77. The EMA Managers are each a culpable "person" within the meaning set forth in RICO, § 1961(3).

78. RICO defines, in relevant part, an "unlawful debt" as:

> a debt (A) … which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).

79. The Loan Contract is governed by New York law, which prohibits the charging, taking, or receiving of interest at a rate exceeding 25% A.P.R. *See* N.Y. Gen. Oblig. Law §§ 5-501, 5-511, 5-521; N.Y. Penal Law § 190.40. *See also Adar Bays, supra.*

80. Through the Loan Contract, the Enterprise charged, took, and received interest from Plaintiff at a rate in excess of 50% A.P.R., or ***more than twice*** the maximum enforceable rate of interest permitted by New York's usury laws.

81. The Enterprise's goal, objective, and/or purpose is to profit from the collection of

usurious debts that are charged through convertible notes, such as the Loan Contract, that charge, in fact, true interest rates that are more than double the lawful maximum, enforceable rate of interest permitted by New York law.

82. Upon information and belief, pursuant to and in furtherance of their scheme, the Enterprise is in the business of making loans at usurious rates of interest and thereby committed multiple acts of unlawful debt collection from a plethora of other desperate public companies throughout the country.

83. The Enterprise, through its managers, agents, and/or employees: (i) locates and solicits microcap issuers, like Plaintiff; (ii) offers funding to microcap issuers; (iii) determines the form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-price conversion right; (iv) funds the usurious loans; and (v) collects the unlawful debt.

84. The Enterprise benefits from the unlawful debt it collected from Plaintiff by receiving all or a portion of the proceeds of the unlawful debts charged under the Loan Contract, which, among other things, enabled the Enterprise to profit from the unlawful debt and/or use the proceeds to fund additional, usurious loans.

85. The Enterprise commits its violations of RICO under the direction and control of the EMA Managers, who—acting either individually and/or collectively—are the ultimate-decision makers and beneficiaries of the Enterprise.

86. The Enterprise conducts its unlawful business through the means and instrumentalities of interstate commerce, including but not limited to interstate emails, mail, wire transfers, and securities transactions.

87. At all times relevant hereto, the EMA Managers, individually and/or collectively, intended to engage in the violations of RICO alleged herein, with actual knowledge of their and

the Enterprise's illegal activities, and not in good faith.

88. The violations of RICO alleged herein have injured and continue to injure Plaintiff and its business and property.

89. As part of its continuous unlawful debt-collection scheme, EMA—at the direction and control of the EMA Managers—charged an unlawful debt onto Plaintiff through the Loan Contract, pursuant to which they collected $907,289.38 worth of consideration from Plaintiff.

90. During the 4-year period preceding the commencement of this action, Plaintiff has suffered out-of-pocket losses of $583,462.45.

91. During the 4-year period preceding the commencement of this action, the Enterprise's unlawful debt-collection consists of three separate collections,[25] with each collection constituting a separate act of unlawful debt-collection in furtherance of the Enterprise's unlawful scheme.

92. The injuries to Plaintiff directly, proximately, reasonably, and foreseeably resulted from or were caused by the violations of RICO alleged herein include, but are not limited to, the remittance of valuable consideration—newly issued shares of Solidus common stock—in excess of the amounts that were actually loaned to Plaintiff through loan transactions that are (i) void in whole because of New York's usury laws,[26] and (ii) charge an interest rate that is at least twice the maximum lawful rate of interest allowed by New York's usury laws.

93. Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the RICO violations alleged herein.

94. All of the foregoing harm was foreseeable by the EMA Managers and was directly and proximately caused by their violations of RICO alleged herein.

---

[25] December 11, 2010; January 12, 2021; and February 25, 2021.

[26] *See Adar Bays, supra.*

95. The assessment of the total damages to Plaintiff due to the EMA Managers' violations of RICO alleged herein is difficult to quantify and will be determined at trial.

***Count II: Unjust Enrichment***

***(Against All Defendants)***

96. Plaintiff repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

97. The Defendants have received valuable benefits from Plaintiff, including, *inter alia*, the stock and profits realized from the acquisition and—upon information and belief—subsequent sale of the unlawfully issued and/or delivered shares of Solidus common stock.

98. These benefits are the result of the wrongful conduct alleged herein in Count I.

99. These benefits are the result of EMA's enforcement of a patently unlawful loan transaction that violates New York's usury laws.

100. By charging an interest rate in excess of 25% A.P.R., EMA violated Section 190.40 of the New York Penal Code, a Class E Felony.

101. The Defendants have unjustly retained these benefits of likely committing a Class E felony at Plaintiff and its stockholders' expense.

102. As a result, the Defendants have been unjustly enriched.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff seeks a Verdict and Judgment against the Defendants herein as follows:

A. On Count I, awarding Plaintiff treble damages in an amount to be determined at trial pursuant to 18 U.S.C. § 1964(c);

B. On Count I, awarding Plaintiff interest and costs and expenses in prosecuting this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c);

C. On Count II, ordering Defendants to return the unlawfully acquired Solidus property or—in the event returning such property is not possible—the value of the unlawfully acquired Plaintiff property in the amount of $812,289.38 (the difference between the amount EMA advanced to Plaintiff under the Loan Contract and the aggregate value of the consideration Defendants wrongfully acquired under the Loan Contract); and

D. For such other and further relief as the Court may deem just, proper, and in the interest of justice.

DATED: June 5, 2023

Respectfully submitted,

**THE BASILE LAW FIRM P.C.**

*/s/ Eric J. Benzenberg*

Eric J. Benzenberg, Esq.
Mark R. Basile, Esq.
Waleed Amer, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.: (516) 455-1500
Fax: (631) 498-0748
Email: eric@thebasilelawfirm.com
mark@thebasilelawfirm.com
waleed@thebasilelawfirm.com

*Attorneys for Plaintiff Solidus Communications, Inc. (f/k/a Telco Cuba, Inc.)*